BEATRICE B. SHIMP AND GLENN D. SHIMP, HER HUS-
BAND, PLAINTIFFS-APPELLANTS, v. PENNSYLVANIA
RAILROAD COMPANY, A CORPORATION OF THE STATE
OF PENNSYLVANIA, DEFENDANT-RESPONDENT.

Argued September 10, 1951—Decided October 1, 1951.

*Mr. Baruch W. Seidman* argued the cause for appellants (*Mr. Irving W. Rubin,* attorney).

*Mr. Stephen V. R. Strong* argued the cause for respondent (*Messrs. Strong & Strong,* attorneys).

The opinion of the court was delivered by

CASE, J.   Mrs. Shimp, whom we shall call the plaintiff, was injured as she was attempting to leave defendant's train after escorting her mother to a seat therein.   Her husband joined in the suit, *per quod.*   Jury verdicts went against the defendant.   On appeal, the Appellate Division reversed (11 *N. J. Super.* 88) upon the ground that the trial court erred in denying defendant's motion for judgment made at the end of the case.   We affirm the judgment of reversal but we are not in accord with so much of the reasoning of the Appellate Division as places upon the defendant the duty of exercising ordinary care.

On May 2, 1949, plaintiff went with her 70-year-old mother and her 26-month-old child to the defendant's railroad station in New Brunswick where her mother was to take a train to the latter's home in Connecticut.   She bought a ticket for her mother, sat in the waiting room for a little

while, then went to the platform and when the train arrived boarded one of the coaches. As she got on the train there was a fair crowd, some persons ahead of her and some behind. After getting a seat for her mother in about the middle of the car, she walked to the front vestibule to alight. With both arms around her child and without making use of either the right or the left handrail, she was in the act of stepping either from the top step to the second or from the second to the third when the train started with what she calls a severe jerk, as a result of which she fell down the vestibule steps to the station platform and sustained the injuries sued upon.

The proof of the breach upon which plaintiff counts rests solely on the unamplified and uncorroborated statement of the plaintiff that the train in starting gave "a jerk," "a severe jerk," a "sudden lurch." Beyond such implications as there may be in those expresions, there is no proof that the motion was unnecessary or unusual. The mere fact that plaintiff fell by reason of a movement of the train when she was off-balance, in the act of transferring her weight from an upper to a lower step, without making use of the railings on either side, carries little corroborative force. The paucity of proof of irregular train motion is made conspicuous by the impressiveness of defendant's contradictory proofs. The act of the plaintiff in attempting to descend the car steps, at a moment when she must have known the train was near its leaving time, without taking the precaution to steady herself by grasping one of the handrails is difficult to understand, particularly as she was burdened with the carrying of her child, a function which, on boarding the train, she had performed with one arm while she carried her mother's suitcase with the other; and it is equally difficult to understand why, if there was an excessive jolting of the train, the mother, lacking some explanation of her absence, was not present at the trial to give corroborative testimony. However, we are assuming for the purposes of the argument that the plaintiff was injured in the manner, and because of the circumstances, which she relates.

The train was of vestibule construction and consisted of 16 cars, of which the first four following the engine were an express or mail car, two parlor cars and a "diner." The named four cars were followed by 12 passenger coaches. Distributed along the length of those 12 passenger coaches were the conductor and eight trainmen. Plaintiff boarded the train without making known to any employee of the railroad company that she proposed to do so, or that she entered otherwise than as a passenger with a ticket for transportation, or that she was with a person who was aged or needed either help or guidance, or that she intended to alight before the train departed, and when she undertook to leave she did so without the carrier's knowledge. It does not appear that the mother was infirm or what the size or weight of her suitcase was or that she was unable to carry the bag herself. Plaintiff could have gone to an entrance serviced by a trainman and announced that her mother needed assistance if that was the fact. The trainman might have undertaken to give the assistance; he might have consented to the boarding of the train by plaintiff; but in either event a new legal situation would have arisen grounded in notice to the defendant. On plaintiff's behalf it is not denied that there was reasonable opportunity for her to call upon or to give notice to the defendant through its authorized servants; the contention is that there was no obligation upon her to do so. The signal that the train was ready to go had gone forward from one trainman to another and so on to the conductor who was so stationed in the first passenger coach that he could and did view the exterior of the whole train and who, having seen that the platform was clear and having received the relayed signal from the trainmen, gave the engineer the order to start.

A person who accompanies a passenger upon a train for the purpose of assisting that passenger is not a trespasser and is not a passenger. It is said in many of the cases that an escort lawfully upon the train in that capacity may, by making his presence and purpose known to the conductor or other responsible person, become entitled to the exercise by the

carrier of ordinary care toward him and thus become, in a legal sense, superior to a mere licensee whose right is only that the carrier refrain from a willful or wanton act but inferior to a passenger whose entitlement is to the exercise of a high degree of care. Some of the cases and some of the textbook authorities, starting with the statement that a person who comes to a railroad station to assist, or merely accompany, a passenger comes with the tacit invitation of the carrier who owes the duty of exercising at least ordinary care to see that such a person is not injured by reason of deficient stational facilities or approaches thereto, carry that same reasoning and conclusion to a person who, as escort, enters the train to give assistance to a passenger. In our opinion there is a vital distinction between the entering of a station or even the station platform and the entering of a train which is on the point of moving.

Many of the authorities which hold for the "ordinary care" doctrine depend upon further conditions, as that the entry to the train is in conformity with a practice approved or acquiesced in by the carrier, or that in having knowledge of the entry and the character thereof the carrier is presumed to agree that the escort may execute his purpose and that the carrier will hold the train a reasonable time for the accomplishment thereof, or that the carrier has in some way committed itself so that the escort becomes either an express or an implied invitee. None of those conditions are shown to exist in this case. Without undertaking to analyze all of the decisions which have held a carrier to the duty of ordinary care with respect to escorts who enter a train with the plan to alight before the train moves, we remark that the factual incidents therein have usually been different from our own. An illustrative case is *Little Rock & Fort Smith Railway Co. v. Lawton,* 55 *Ark.* 428, 15 *L. R. A.* 434 (*Ark. Sup. Ct.* 1892), one of the early decisions which, because of wide citation, has become a leading case for the invitee rule. The opinion, while holding that a railroad company in permitting an escort to enter a train with knowledge of his purpose was bound to

hold the train a reasonable time to enable him to leave, further states:

> "The court charged the jury that, if the employees upon the cars offered to assist the lady and child to a seat, and to care for their hand-baggage, the plaintiff had no right to enter the car, and the defendant owed him no duty, except to refrain from willful or wanton injury to him. This was proper, for, if the defendant's employes offered to perform that service, there was no necessity for an escort, and the act of plaintiff in going on the cars was not done upon any implied invitation of the defendant."

The railroad employees in the instant case did not specifically offer to assist the plaintiff's mother. They could hardly have done so because no request was made upon them and they had no knowledge of the need or that plaintiff was entering otherwise than as a passenger. But they were scattered along the length of the train and were available for that purpose. We have potentially that which the *Little Rock* case declared would relieve the carrier from any duty beyond refraining from willful or wanton injury.

*Hutchinson on Carriers* (*3d ed.*), *vol. 2, p.* 1137, *sec.* 991 (1906), expressing the same thought, states that one who goes on a train to render necessary assistance to a passenger

> "in conformity with a practice approved or acquiesced in by the carrier, has a right to render the needed assistance and leave the train, and the carrier in permitting him to enter with knowledge of his purpose, is presumed to agree that he may execute it and is bound to hold the train a reasonable time therefor. If he is injured by reason of the sudden starting of the train or the omission to give the customary signals the carrier will be liable. But the duty of the carrier in this respect is dependent upon the knowledge of such person's purpose by those in charge of the train, for without such knowledge they may reasonably conclude that he entered to become a passenger and cause the train to be moved after giving him a reasonable time to get aboard. He should, accordingly, notify someone in the management of the train of his presence, business or purpose so as to create some relation to the carrier and thus make it its duty to care for him."

To the same effect are *Coleman v. Georgia Railroad & Banking Co.*, 10 *S. E.* 498 (*Georgia Sup. Ct.* 1889) ; *Griswold v.*

*Chicago & N. W. Ry. Co.,* 26 *N. W.* 101 (*Wis.* 1885); *Whaley v. Louisville & Nashville Railroad Company,* 52 *L. R. A.* (*N. S.*) 179 (*Ala. Sup. Ct.* 1914); *Charron v. Canadian Pacific Ry. Co.,* 115 *Vt.* 225, 55 *A.* 2*d* 614 (*Vt. Sup. Ct.* 1947); *Cole's Administrator v. Chesapeake & Ohio R. Co.,* 113 *S. W.* 822 (*Ct. of App. Ky.* 1908); *Chesapeake & Ohio R. Co. v. Paris,* 107 *Va.* 408, 59 *S. E.* 398 (*Va. Sup. Ct. of App.* 1907); *Midland Valley R. Co. v. Bailey,* 124 *Pac.* 987 (*Okl. Sup.* 1912).

In *Atlantic Coast Line R. Co. v. Watson,* 110 *So.* 316 (*Sup. Ct. Ala.* 1926) it was said of the duty owing by a carrier to an escort:.

> "In order to impose upon defendant the duty of exercising ordinary and reasonable care not to injure him while alighting from the train—including the obligation to allow him a reasonable time to safely alight—it was necessary to show that defendant's conductor, or some other responsible trainman, knew or had notice that he was not a passenger and that he intended to leave the train as soon as his mission was accomplished."

█ 46 *L. R. A.* (*N. S.*) 358, treating of a person who enters a train to assist a passenger, states the rule thus:

> "In the absence of any notice, either actual or constructive, it seems that the carrier owes no duty to a person thus entering its train, except not to injure him wilfully or wantonly."

While there have been some differences of opinion as to the general duty of care owed to such a person, the better view seems to be as thus expressed.

██ Plaintiff did not avail herself of the train service which was at her command or give notice to the defendant company of her own status and purpose or of her mother's need, if there was need, for assistance. With changed railroad conditions, the handling of large crowds, the need for speedy transportation, the improved means of propulsion by which a faster start is accomplished, the carefully prepared schedules and the pressure of keeping so far as may be to those schedules, and the busy use of tracks and terminal

facilities in the metropolitan area by transcontinental railroad systems, has come the consequent need to conserve time at station stops. There was no express invitation, and under the circumstances of the case and the conditions under which the train was operated we find no implied invitation, to the plaintiff to enter the train. Viewed in the light of the facts we think plaintiff went on the train as a mere licensee to whom the defendant owed the duty merely to avoid a willful or wanton act and that she did nothing to raise her status to that of one who should be the object of ordinary care. There was no willful or wanton act.

Defendant's motion for judgment should have been granted. The judgment of the Appellate Division reversing the judgment of the trial court will be affirmed. The record will be remanded to the end that judgment for the defendant and against the plaintiffs be entered in the Middlesex County Court, with costs both below and here.

WACHENFELD, J. (concurring). I am to affirm the judgment of reversal but not for the reasons stated in the majority opinion. I am in accord with the reasoning in reference to and the conclusions of the Appellate Division as to the duty of the defendant to exercise ordinary care.

WACHENFELD, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—None.